IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  20-cr-00090-REB

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. HUGUES BELLEVUE II,
   a/k/a "Hughes Bellevue",

Defendant.

_____

**DEFENDANT'S OBJECTION TO THE PRESENTENCE
INVESTIGATIVE REPORT [Doc. 37]**
_____

Hugues Bellevue, II, by and through undersigned court-appointed counsel, hereby submits these objections to the Presentence Investigative Report ("PSIR") [Doc. 37]:

1. Mr. Bellevue pled guilty to Count 1 of the four-count Indictment charging Distribution of Controlled Substances. He further agreed to items for forfeiture, and a limited appellate waiver delineated in the plea paperwork. In exchange, the government agreed to dismiss the remaining Counts 2 through 4, to recommend full credit for acceptance of responsibility, to not bring other charges against Mr. Bellevue based on information known to the government, and to not allege relevant conduct related to drug quantities beyond what is included in the plea paperwork. The plea paperwork also contains agreements between the parties regarding the applicability (or non-applicability) of certain guideline provisions.

2.     Mr. Bellevue raises two objections and one clarification to the PSIR. First, he objects to the 2-level enhancement recommended for maintaining a "stash house" under U.S.S.G. § 2D1.1(b)(12).  Second, he objects to the inclusion of facts not agreed to in the plea agreement. Third, he offers a few clarifications of facts that do not impact the guideline calculation.

### A.     Objection to the Stash House Enhancement

3.     In paragraphs 81-85 of the PSIR, the probation officer recommends imposing the 2-level enhancement authorized by U.S.S.G. § 2D1.1(b)(12). This Court should reject the sentencing aggravator, dubbed the "stash-house" enhancement. *See, e.g., United States v. Lozano*, 921 F.3d 942, 946 (10th Cir. 2019) and *United States v. Cortez-Diaz*, 565 F. App'x 741, 748 (10th Cir. 2014).

4.     The parties discussed the stash-house enhancement during plea negotiations. And while the application is a close call, the parties determined that the stash-house provision was inapplicable given the factors evaluated, and the facts known to the parties. *See* Plea Agreement, DOC 34, Section VI(e). These considerations move the needle to the government's inability to prove the stash-house enhancement as it must, by a preponderance of the evidence. *Lozano*, 921 F.3d at 946.

5.     Section 2D1.1 of the Guideline Manual governs drug cases generally, setting the base-offense level depending on the quantity of drugs and authorizing several specific offense characteristics. One such offense characteristic is the stash-house enhancement, which calls for a 2-level boost to the guideline calculation "[if the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12).

6.      Crucial to understanding the stash-house enhancement is Application Note 17. For one thing, Note 17 clarifies that using one's home to *store* drugs qualifies as "manufacturing or distributing a controlled substance," and on the one day law enforcement executed a search warrant of his house, Mr. Bellevue was undeniably storing some drugs in his home. On February 25, 2020, officers found 22.3 grams of methamphetamine and 751 tablets of alprazolam, PSIR at ¶ 17. But the Note also demands that drug storage "be one of the defendant's primary or principal uses for the premises, rather than one of [his] incidental or collateral uses for the premises." U.S.S.G. § 2D1.1 (cmt 17). "In making this determination, the court should consider how frequently the premises was used by the defendant for [storing] a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id*.

7.      Besides frequency of use, the Tenth Circuit has added a second element to the test. Before "drug-related activity [can] constitute a primary use of the residence," the court requires that drug storage "not only be frequent but also substantial." *United States v. Murphy*, 901 F.3d 1185, 1191 (10th Cir. 2018). "And the frequent/substantial metric is a reciprocal sliding scale," explains *Murphy*, the leading stash-house case in the Tenth Circuit. *Id*. This variable yardstick means small quantities of drugs found inside a home will trigger the enhancement if, but only if, the government can further show that the defendant frequently stored drugs there. *See id*.

8.      "The analysis comes down to a 'totality of the circumstances' evaluation, something trial judges are well equipped for and regularly perform," says *Murphy*. *Id*. This "assessment includes: (1) the frequency and number of drugs sales occurring at the home; (2) the quantities of drugs bought, sold, manufactured, or stored in the home;

3

(3) whether drug proceeds, employees, customers, and tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home; and (4) the significance of the premises to the drug venture." *Id*., at 1191-92.

9. On three of the four *Murphy* factors, the government cannot sustain its evidentiary burden. (Only factor 3 tilts its way).

10. The evidence fails to meet the burden upon examination of the factors. First, the evidence agreed to in the plea agreement does not establish multiple sales from Mr. Bellevue's home, nor is there traffic in and out of his home for any sales. All of the sales alleged in this case were over dark web sites that do not rely on physical locations or exchanges of money for drugs. Second, law enforcement only determined storage on one particular date – February 25, 2020. Third, as identified by the probation officer in the PSIR, "the quantities [of drugs] he sold were not in significant bulk." (Exhibit A of PSIR, p. R-3). The presence of a home for dark web sales is inconsequential to the sale; the amount of drugs found at his home was not particularly large, and the amount of sales engaged by Mr. Bellevue relevant to our matter is not particularly numerous.

12. The probation report rests its opinion <u>entirely</u> on *United States v. Murphy*, even though the case stands more aptly in Mr. Bellevue's corner. Four full paragraphs of the report dedicate themselves to an exegesis of *Murphy* (¶¶ 81-84), mostly in service of the unremarkable proposition that a residence can be used for both lawful and unlawful purposes. The report culminates in ¶ 85, which states, "The probation officer believes that the 10th Circuit's findings in *Murphy* support application of this enhancement in this case."

13. We disagree with the reasoning in the PSIR, much of it due to the many facts that distinguish *Murphy* from this case.

14. For starters, officers investigating defendant Murphy executed *four* search warrants against his home on four dates, over *two* years. Each time they seized some combination of money, drugs, and paraphernalia. Two actual drug sales took place there. *Murphy*, 901 F.3d at 1187-88. Plus, Murphy was repeatedly observed traveling directly from his home to venues where he sold drugs, *id*. at 1189. This close nexus between home and drugs further proved "ongoing storage at his residence," said the court, adding his "drug-related use of the home was chronic, not merely episodic." *Id*., at 1192. Indeed, it wasn't so much Murphy's home as a "warehouse" for drugs and the "headquarters" of his operation. *Id*.

15. The intensity and frequency of Murphy's drug-related use of his residence echoes other cases in which the Tenth Circuit has imposed the stash-house enhancement. Take, for example, *United States v. Henderson*, 604 F. App'x 655, 658-59 (10th Cir. 2015). Police officers surveilled Henderson's house for 5-6 months and observed dozens of people entering and exiting in a manner believed to be consistent with drug-trafficking activity. *Id*., at 656, 658. A confidential informant made several controlled drug purchases at or near the residence. *Id*.

16. Contrast the use of Mr. Bellevue's home. No physical drug sales unfolded there. Nor is there evidence of "ongoing storage." Hardly. On a single day in February 2020, the day Mr. Bellevue was arrested, case agents found what the probation officer has generally conceded was, overall (and not just at the house), "quantities… not in significant bulk."

17. At the same time, Mr. Bellevue's residence was a genuine home in every sense of the word. His father lived there for decades, and Mr. Bellevue would spend time with his father at this house throughout his life. This home was his primary residence for the three years prior to his arrest. In 2013, when his father was kidnapped and murdered, it was in this home that Mr. Bellevue waited for his father to come home from the clinic in Mexico. At the time, he was spending more time with his father, and took over primary duties of taking care of the house. And this is the place to which Mr. Bellevue will return upon his release from custody. PSIR at ¶ 112. Mr. Bellevue slept most every night at this residence, he cooked and ate almost all his meals at this residence, and he took care of the residence as a place for him to live.

18. The facts above do not just distinguish Mr. Bellevue's "incidental" use of his home for storing drugs from defendant Murphy's maintenance of a residential "warehouse" for *his* drugs. They are also facts this Court must "consider" as it compares "the frequency of lawful and unlawful activity at" Mr. Bellevue's residence, facts essential "in deciding whether drug-related activities were a primary, rather than incidental, use of the premises." *Murphy*, 901 F.3d at 1191. That incidental vs. primary calculus weighs slightly in Mr. Bellevue's favor, an assertion the government can topple only by marshaling a preponderance of the evidence to the contrary.

19. Counsel for Mr. Bellevue conferred with AUSA Andrea Surratt as to this objection regarding the stash house, and Ms. Surratt authorized counsel to inform the Court that the government agrees with Mr. Bellevue's position on this issue.

20. The Court should reject the 2-level enhancement under U.S.S.G. § 2D1.1(b)(12). Mr. Bellevue's residence was a home, not a stash house.

  B. <u>Objection to the Inclusion of Facts Not Agreed to by Mr. Bellevue</u>

  20. Paragraphs 19-74 of the PSIR contain information that Mr. Bellevue did not agree to be included in the PSIR. Mr. Bellevue does not affirm the veracity of these facts, and objects to their inclusion in his PSIR.

  C. <u>Clarifications of Information Contained in the PSIR That Does Not Affect the Court's Guideline Calculation</u>.

  21. Mr. Bellevue's substance abuse and addiction is complicated because of overlapping drug abuse, stints of sobriety, and early illicit use and abuse of drugs that did not initially manifest into addiction. The dissection of this abuse by substances is difficult to follow in the PSIR. Mr. Bellevue began abusing his mother's (and others') prescription medications when he was 12 or 13 years old. In the recovery from his two car accidents, in 2008 (at age 18) and 2011 (at age 21), he became addicted to opiates. In 2009, he tried heroin for the first time, but mainly fed his drug addiction with prescription opiates. By 2012, he had shifted from prescription opiates to black tar heroin as an addictive substance. In 2013, he entered a drug treatment and rehabilitation center in Pacific Beach, California, and an additional sober living rehabilitation center in La Jolla. Mr. Bellevue had a sustained period of sobriety, before some minor relapses punctuated the sobriety, and then full relapse.  All of this was complicated by the kidnapping and presumed murder of his namesake father in 2013. After Dr. Bellevue's disappearance, he was presumed dead, but not declared dead for several years. Dr. Bellevue's body was never found. Eventually, Hughes Bellevue, II primarily substituted his heroin addiction with fentanyl and Xanax addictions. Those addictions are what sent him to the hospital with withdrawal symptoms on the day of his arrest in this case.

Respectfully submitted,

*s/ Kevin M. McGreevy*
**Kevin M. McGreevy**
RIDLEY, MCGREEVY & WINOCUR, P.C.
303 16th Street, Suite 200
Denver, Colorado  80202
Telephone:  (303) 629-9700
Facsimile:   (303) 629-9702
E-mail:   mcgreevy@ridleylaw.com
**Attorney for Defendant Hugues Bellevue, II**

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing **DEFENDANT'S OBJECTION TO THE PRESENTENCE INVESTIGATIVE REPORT [Doc. 37]** was electronically filed with the Clerk of the Court using the CM/ECF system on this 27th day of October, 2021, which will send notification of such filing to the following e-mail addresses:

Andrea Surratt, AUSA
1225 17th Street, Suite 700
Denver, Colorado  80202

*s/ Polly Ashley*
Polly Ashley