**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 20-cr-00090-REB

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1. HUGUES BELLEVUE II,

a/k/a/ Hughes Bellevue,

       Defendant.

_____

**DEFENDANT HUGUES BELLEVUE'S MOTION FOR A BELOW GUIDELINE OR STATUTORY "VARIANT" SENTENCE**
_____

Hugues Bellevue, through undersigned counsel, and pursuant to D.C.COLO.LCrR 32.1, respectfully moves this Court to impose a "variant" sentence below the advisory guideline range. Mr. Bellevue requests that the Court exercise its discretion and impose a sentence of seventy-two months imprisonment, which is in excess of the statutory minimum yet slightly below the Probation Department's recommendation [Doc. 37].

**I.**   **The Procedure to be Followed in Sentencing**

This Court is charged with determining an appropriate sentence based on the individual circumstances of each defendant who appears before it. In fashioning an appropriate sentence, the Court begins by correctly calculating the Guideline's sentencing range. *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586 (2007). However, this calculation serves as the starting point for the Court's calculation. *Id.,* at 596.

After reviewing the advisory guideline sentence, the Court assesses the case "based on the facts presented" and within the framework of 18 U.S.C. § 3553(a). *Id.,* at 597. The Court may not presume that this guideline range is reasonable, instead, it must make an individualized assessment based on the facts presented, considering all of the § 3553(a) factors.

### a. Advisory Sentencing Guideline Calculation

The parties agree that the maximum statutory penalty for Count One of the Indictment [Doc. 7] is forty years imprisonment. 21 U.S.C. § 841(a)(1) and (b)(1)(B). The parties agree to an adjusted offense level of 32, and the Government agrees to a two-point reduction for acceptance of responsibility pursuant to § 3E1.1(a) of the Sentencing Guidelines, with an additional one-point reduction pursuant to § 3E1.1(b). The parties further agree that the guideline provision requiring a two-level offense level enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) for maintaining a premise for purposes of distributing controlled substances does not apply. Accordingly, the parties believe the total offense level is 29. Based upon this calculation and assuming the Court determines a total criminal history score of 5 (criminal history category III), the corresponding guideline imprisonment range would be 108-135 months imprisonment.

### b. Individualized Assessment Pursuant to 18 U.S.C. § 3553(a)

After computing the guideline sentence range, the sentencing court must then turn to the § 3553 analysis. 18 U.S.C. § 3553 requires a court to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." To accomplish this, the Court must consider seven factors and then, in its discretion, determine how each factor applies. Ultimately, a

sentencing court may impose a variant sentence if it concludes that the guideline sentence proposed exceeds the necessary sentence required to achieve § 3553(a)'s sentencing purposes.

## II. <u>18 U.S.C. § 3553(a) Supports a Variant Sentence of Seventy-Two Months Imprisonment</u>

Mr. Bellevue requests that this Court impose a variant sentence of seventy-two months imprisonment. For the reasons set forth in detail below, this sentence would be "sufficient, but not greater than necessary" to comply with the purpose of § 3553(a)(2). Mr. Bellevue now addresses each of the relevant factors in turn.

### a. <u>Section 3553(a)(1) – The Nature and Circumstances of the Offense and History and Characteristics of the Defendant.</u>

While this Court has sentenced numerous defendants with histories of childhood trauma and substance abuse, Mr. Bellevue's circumstances and personal characteristics are still compelling and unique in terms of the severity of his childhood trauma and the magnitude of his personal substance use. The offense conduct in his case is perhaps best understood after evaluating the persistent and prolonged trauma that began during Mr. Bellevue's childhood development and continued until the time of his arrest.

Although the PSIR reflects that Mr. Bellevue dismissed any possible traumatic childhood incidents by saying "if there was, it has long since been buried," [Doc. 37, ¶ 110], interviews conducted by the Probation Department and by counsel document an extensive history of parental abuse and neglect, culminating in Mr. Bellevue's crippling addiction.

Mr. Bellevue was born in 1990 to Hugues Bellevue, Sr., and Sammie Williams. Mr. Bellevue, Sr., emigrated from Haiti, attended medical school, and founded an oncology

3

practice in Playas de Tijuana, Mexico. Sammie, who had stopped working a decade prior to Hugues, II's birth, homeschooled Hugues amidst her own undiagnosed and untreated mental illness.

Mr. Bellevue's childhood was particularly isolating. His earliest memory of his father is of his dad moving out of their family home—he does not have any independent memories in which his parents lived together. Not only was his father out of the family home, but he was consumed with his medical practice and various charitable work. Sometimes Dr. Bellevue would take his young son to Mexico or out to eat when he was back in San Diego, but Mr. Bellevue's primary parent was his mother.

Sadly, his mother struggled with both physical and mental illness. For unknown reasons, she chose to homeschool her son, and throughout Mr. Bellevue's childhood, she became more and more of a recluse, thus contributing to Mr. Bellevue's isolation from peers and a larger community. Mrs. Bellevue refused to see a doctor, but those who know her best believe she likely suffered from bouts of agoraphobia, severe, social anxiety, and depression. By the time Mr. Bellevue turned 12, his mother refused to be in public, and so all of the household responsibilities outside of the home fell on young Hugues. As early as 12, Mr. Bellevue was responsible for grocery shopping and other household errands. In addition to isolating her son, Mrs. Bellevue physically abused him from about the time he was 5 years old until he was large enough to defend himself. She collected various items: figures, tea sets, and china dolls. Though Mr. Bellevue was careful never to touch any of his mother's things, these items would mysteriously get broken in the house and his mother would accuse him of being responsible. She would then beat him with a variety of objects: belts, extension cords, anything she could get her

4

hands on---until he bled.  Mr. Bellevue's body still reflects the impact of her abuse.  Though he once threatened to call the police, his mother kept him from doing so by threatening that child protective services would get called and take him to live somewhere even worse.  By this time in Mr. Bellevue's childhood, Dr. Bellevue only visited his son a few times per year, and so Mr. Bellevue felt unable to confide in his father and report the abuse to him.

Mrs. Bellevue's physical abuse ceased once her son was large enough to defend himself, but her control and isolation of him continued.  Despite the fact that she claimed to homeschool her son, his studies were never reported to the California Board of Education.  At age 16, Mr. Bellevue began taking classes at San Diego State University, although at first his mother would drive him to his college courses, wait in the car until he finished, and then drive him home.  Eventually, a teenage Mr. Bellevue began asserting more independence, but he was emotionally and mentally ill-prepared to manage the challenges of being in a less controlled environment with older peers.  He started working part-time at various jobs, and moved into a friend's apartment.  He had a natural aptitude for academics, and was incredibly hardworking: on the days when he didn't have classes, Mr. Bellevue would work from 4am-1pm at Starbucks, and then walk to Home Depot where he worked a 1pm-9pm shift.  Despite his commitment to academics and work, he began to struggle after he became heavily addicted to opiates.

Although Mr. Bellevue became addicted to opiates in college, it was certainly not his first experience with substances.  At age 10, he was alone at home one day and drank a bottle of wine out of his mother's liquor cabinet, then threw up.  At age 12, he was introduced to marijuana, which became a drug that he always thought he could handle

5

but which became inextricably linked with heavy opiate use.  At age 13, his mother gave him two Vicodin one day when he had a headache.  He recalls it as being one of the most blissful experiences of his life, and after that, he started "helping himself" to his mother's Vicodin prescription.  Shortly thereafter, Mrs. Bellevue's hairdresser began staying at the family home, and Mr. Bellevue was introduced to morphine and Lortab.  Later in high school, he experimented with methamphetamine, cocaine, and ecstasy, and at age 17 his supervisor at a telemarketing company introduced him to Oxycontin. Mr. Bellevue had started using black tar heroin, and became addicted, but that gave way to fentanyl after trying a friend's grandmother's prescribed fentanyl lollipop.  From then on, Oxycontin and fentanyl were Mr. Bellevue's primary drugs, which he used daily.

In 2011, Mr. Bellevue was in the throes of addiction when he learned that his girlfriend, Yaxha, was pregnant. At age  21, he became a father to Hugues Bellevue, III, and the next year, became entangled in the criminal justice system. He reconnected with his father, who was still working in Mexico, and his father offered to help him get into rehab.  He accepted Dr. Bellevue's offer, went to rehab, and moved in with his father.  He recalls that as being the time his life was finally on track—he was finally building a relationship with his dad, he was parenting his young son, and he was 13 months sober.  However, in the midst of his attempts to rebuild his life, tragedy stuck.

On November 11, 2013, Dr. Bellevue left for work in Tijuana.  Dr. Bellevue and Hugues, II, planned to have dinner together at home that night, but Dr. Bellevue never came home.  Mr. Bellevue waited for his dad to come home that night, but his dad never returned, never called, and all of his calls to his dad went unanswered.  When 24 hours passed without hearing from his father, Hugues, II, and his mother reported the

6

disappearance to the police, knowing that something was very wrong. When investigators searched Dr. Bellevue's office in Tijuana, they did not recover a body, but the office was covered in blood. As authorities started alerting family about their findings that weekend, Mr. Bellevue relapsed. Though his father's body was never found, investigators ultimately (and eventually, after the Bellevue family hired a private investigator to investigate the case months later) concluded that he had been brutally murdered.

Following that relapse, Mr. Bellevue never truly recovered or had a meaningful period of sobriety. Upon reflection, he believes that this was the hardest time of his life, and he turned back to substances to repress all of the emotions that he was unprepared to navigate. Over the next couple of years, he tried to get clean again but was unsuccessful. He accidentally overdosed, attempted suicide, and was in a serious car accident in which his head went through the windshield, causing a traumatic brain injury. His brain injury combined with his substance abuse and severe underlying depression made every day functioning impossible. His former girlfriend and the mother of his son, Yaxha Mancillas, recalls that during this period of time, Mr. Bellevue would take muscle relaxers and opiates that were prescribed to him after his accident and sleep for 3-4 days at a time. When asked, Mr. Bellevue has very little independent recollection about this period of his life.

Finally, Ms. Mancillas gave Mr. Bellevue an ultimatum—get sober or she would leave him, and take their son with her. But at that point, Mr. Bellevue was all but incapable of helping himself. Following an order requiring him to pay $40,000 in child support, he turned to selling the same drugs he was using on the dark web. His mother's health was declining, his father was dead, and he had lost his partner and his son. Upon reflection,

he now believes that his arrest was inevitable, that he was on a downward spiral and was intent on self-destruction.  Following his arrest and detention in Colorado, Mr. Bellevue's mother passed away on November 3, 2020, after battling kidney disease.  Due to COVID-related lockdowns and restrictions on calls at FDC, family members were unable to reach Mr. Bellevue to let him know that his mother had gone into hospice care. Because of this, Mr. Bellevue only learned of the news two days after his mother had passed away.

Despite the trauma that Mr. Bellevue has endured and the inevitable prison sentence he faces, he has developed perspective while incarcerated and retains hope for his future.  He dreams of finishing his college degree, perhaps becoming a teacher or a writer and sharing his experiences with others.  He wants to engage in recovery and support others who struggle with addiction.  Most of all, he wants to make his son proud of him and to honor his father, Dr. Bellevue.  He recognizes that all he desires in life can only be realized if he is sober.

When Mr. Bellevue's offense is considered alongside his life history and personal circumstances, it is apparent that his conduct, although serious, was motivated by his desire to support his own addiction. As noted by the PSIR, Mr. Bellevue's addiction arose within the context of intergenerational substance abuse: in addition to his mother, his brother also struggled with addiction, and four of his maternal uncles died from heroin overdoses. [Doc, 37, ¶ 134]. Furthermore, Mr. Bellevue's criminal history category over-represents the seriousness of prior criminal conduct. In particular, Mr. Bellevue receives three criminal history points for failing to appear on a misdemeanor driving offense that was ultimately dismissed. [Doc. 37, ¶ 97-100]. Accordingly, Mr. Bellevue respectfully submits that his history and characteristics combined with the nature of the offense

8

support a sentence in excess of the statutory minimum, yet below the advisory guideline range.

### b. Section 3553(a)(2) – Purpose of Sentencing

A sentence of seventy-two months will also promote the purposes of sentencing. The Court's prerogative is to impose a sentence that is sufficient but not greater than necessary to promote the following objectives: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553.

When considering these factors, Mr. Bellevue requests that this Court consider his recognition of the gravity of this offense and his desire to find a way to maintain permanent sobriety once he completes his prison sentence. As noted in the initial PSIR [Doc. 37], after his hospitalization for drug withdrawal symptoms following his arrest, Mr. Bellevue has been taking an anti-convulsant drug prescribed to him.  He is also committed to continuing his education, and has taken classes while at FDC-Englewood.

Additionally, a seventy-two month sentence is significant—it does not undermine the seriousness of Mr. Bellevue's offense.  To the contrary, it is six times longer than any other sentence of incarceration that Mr. Bellevue has ever served.  As noted in the PSIR, Mr. Bellevue's longest (and only) prior sentence of incarceration was twelve months. That twelve-month sentence was associated with Mr. Bellevue's only felony conviction prior to this case.  Notably, this felony conviction would have cemented Mr. Bellevue's

criminal history as Category II, but for the fact that Mr. Bellevue was on probation for a misdemeanor failure to appear charge while he engaged in conduct related to his instant offense. Accordingly, a sentence of seventy-two months promotes respect for the law and serves an adequate punitive function.

Finally, Mr. Bellevue submits that a seventy-two month sentence, combined with the four years of supervised release as recommended by the Probation Department, will allow a sufficient time of incarceration and supervision for Mr. Bellevue to participate in the mental health and substance abuse treatments, and maintain a significant period of sustained sobriety prior to beginning his supervised release. Accordingly, he respectfully contends that a seventy-two month sentence will effectuate the purposes of sentencing pursuant to § 3553(a)(2).

### c. Section 3553(a)(3) – Kind of Sentences Available

The only sentence available to the Court is a sentence of imprisonment, as probation is expressly precluded by statute. 21 U.S.C. §841(b)(1)(B)(viii); USSG §5B1.1(b)(2).

### d. Section 3553(a)(4) and (5) – Guideline Range and Sentencing Commission's Policy Statement

Section 3553(a)(4) and (5) direct the Court to consider the sentencing range established by the Sentencing Guidelines, in addition to the Commission's pertinent policy statements. The relevant guidelines have already been set forth in the Plea Agreement [Doc. 34] and in Mr. Bellevue's Objections to the PSIR [Doc. 38], which is consistent with the parties' position in the Plea Agreement. Mr. Bellevue requests a variant sentence

based upon the information provided through this motion, the PSIR, and his objections to the PSIR.

### e. Avoiding Unwarranted Sentencing Disparities

Mr. Bellevue recognizes that individuals convicted of offenses involving drug distribution are sentenced by this Court based on a number of different factors. However, he submits that a sentence of seventy-two months avoids general unwarranted sentencing disparities or inequity, as it is still in excess of the statutory mandatory minimum. As the Court is aware, there are no other co-defendants who have been charged and subsequently sentenced pursuant to the Indictment in Mr. Bellevue's case.

### f. Section 3553(a)(7) – Need for Restitution

Restitution is not an issue in this case.

### III.   Conclusion

For the foregoing reasons, Mr. Bellevue moves this Court to find that a sentence of seventy-two months followed by four years of supervised release is sufficient, but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

RIDLEY, MCGREEVY & WINOCUR, P.C.

 s/ Kevin M. McGreevy
Kevin M. McGreevy
303 16th Street, Suite 200
Denver, CO 80202
Tel:  303.629.9700
Fax:  303.629.9702
Email: mcgreevy@ridleylaw.com
**Attorney for Hugues Bellevue, II**

11

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2021, I electronically filed the foregoing **DEFENDANT HUGUES BELLEVUE'S MOTION FOR A BELOW GUIDELINE OR STATUTORY "VARIANT" SENTENCE** with the Clerk of the Court using the CM/ECF system which will send electronic notification to all counsel of record.

Andrea Surratt, AUSA
1225 17th Street, Suite 700
Denver, Colorado  80202

*s/Polly Ashley*
Polly Ashley